IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TIMOTHY LEANG JONES, | ) | No. C 10-0177 CRB (PR) |
| Plaintiff, | ) ) | ORDER GRANTING DEFENDANTS' MOTION TO |
| v. | ) ) ) | DISMISS: GRANTING IN PART DEFENDANTS' MOTION FOR |
| SUE HUBBARD, et al., | ) ) ) | SUMMARY JUDGMENT: REFERRING MATTER TO MAGISTRATE JUDGE FOR |
| Defendants. | ) ) | SETTLEMENT PROCEEDINGS |
| _____ | ) | (Docket # 95, 123) |

Plaintiff Timothy L. Jones, a state prisoner, filed a Second Amended Complaint (SAC) for damages under 42 U.S.C. § 1983 alleging violations of his constitutional rights while at Salinas Valley State Prison (SVSP). Docket # 69. Specifically, Jones alleges that SVSP correctional officers improperly terminated a family visitation which violated his First Amendment right, and that when he protested, officers used excessive force and then denied him medical care for his bleeding injuries. The court found cognizable Jones's claims against the SVSP employees. Docket # 9 at 2.

///

///

Defendants[1] move to dismiss the SAC for failure to exhaust administrative remedies, and in the alternative, move for summary judgment on the grounds that there are no genuine issues of material fact in dispute and that they are entitled to judgment as a matter of law.  Docket # 95.  Defendants also contend that they are entitled to qualified immunity.  Id.  Defendants Blevins, Roman and Scarlett move separately for summary judgment on the grounds that they are entitled to judgment as a matter of law, and that they are entitled to qualified immunity.  Docket # 123.  Jones has filed oppositions to both motions, and defendants have filed replies.

## DISCUSSION

I.      Exhaustion of Administrative Remedies

Defendants first move to dismiss Jones's First Amendment claims, deliberate indifference to serious medical needs claims, his second excessive force claim[2], and his supervisory liability claims on the grounds that he failed to exhaust his administrative remedies.  Docket # 95.

The Prison Litigation Reform Act of 1995 ("PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

---

[1]Defendants who move to dismiss include Sue Hubbard, M. S. Evans, G. A. Neotti, G. Ponder, K. Nuckles, M. Atchley, M. Kircher, W. Rasley, D. Bittner, J. Rodriguez, D. Ponce, J. Mora, M. Nicholson, S. Zavala, J. Argueta, T. Tomasian, J. J. Rodriguez, C. H. Santos, A. Richmond, A. Butt, M. Eckert and B. Okelly.

[2] Defendants characterize Jones's excessive force claims as arising from two separate incidents: (1) the alleged actions of defendants after the termination of Jones's visit; and (2) the alleged actions of defendants after Jones was placed in holding cell no. 5.

2

remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  Although once

within the discretion of the district court, exhaustion in prisoner cases covered by

§ 1997e(a) is now mandatory.  Porter v. Nussle, 534 U.S. 516, 524 (2002).  All

available remedies must now be exhausted; those remedies "need not meet

federal standards, nor must they be 'plain, speedy, and effective.'"  Id. (citation

omitted).  Even when the prisoner seeks relief not available in grievance

proceedings, notably money damages, exhaustion is a prerequisite to suit.  Id.;

Booth v. Churner, 532 U.S. 731, 741 (2001).  Similarly, exhaustion is a

prerequisite to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or

some other wrong.  Porter, 534 U.S. at 532.  The PLRA exhaustion requirement

requires "proper exhaustion" of available administrative remedies.  Woodford v.

Ngo, 548 U.S. 81, 93 (2006).

    Nonexhaustion under § 1997e(a) is an affirmative defense.  Wyatt v.

Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).  It should be treated as a matter of

abatement and brought in an "unenumerated Rule 12(b) motion rather than [in] a

motion for summary judgment."  Id. (citations omitted).  In deciding a motion to

dismiss for failure to exhaust administrative remedies under § 1997e(a), the court

may look beyond the pleadings and decide disputed issues of fact.  Id. at 1119-

20.  If the court concludes that the prisoner has not exhausted the jail's or

prison's administrative process, the proper remedy is dismissal without prejudice.

Id.

    The California Department of Corrections and Rehabilitation ("CDCR")

provides its inmates and parolees the right to appeal administratively "any

departmental decision, action, condition, or policy which they can demonstrate as

having an adverse effect upon their welfare."  Cal. Code Regs. tit. 15,

§ 3084.1(a).  It also provides its inmates the right to file administrative appeals alleging misconduct by correctional officers.  See id. § 3084.1(e).  In order to exhaust available administrative remedies within this system, a prisoner must submit his complaint on CDCR Form 602 (referred to as a "602") and proceed through several levels of appeal: (1) informal level grievance filed directly with any correctional staff member, (2) first formal level appeal filed with one of the institution's appeal coordinators, (3) second formal level appeal filed with the institution head or designee, and (4) third formal level appeal filed with the CDCR director or designee.  Id. § 3084.5; Brodheim v. Cry, 584 F.3d 1262, 1264-65 (9th Cir. 2009); Barry v. Ratelle, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997).  This satisfies the administrative remedies exhaustion requirement under § 1997e(a).  Barry, 985 F. Supp. at 1237-38.

Jones filed a grievance concerning medical treatment and accommodations on or about February 8, 2008, in which he stated: "On 2-2-08, I was assaulted and battered by SVSP-C Facility Staff who deliberately broke my glasses after I requested to see a rule, regulation or memorandum."  E. Medina Decl., Ex. C. Jones requested a new pair of prescription glasses.  Id.  Jones was informed that his allegations of assault by staff would be split from his request for new glasses and would be processed as a staff complaint.  Id. ¶ 8.  The staff assault grievance was assigned appeal number SVSP-I-08-00678, and the grievance regarding his broken glasses was assigned appeal number SVSP-I-08-00679.  Id.

On February 12, 2008, Jones filed another grievance alleging excessive force by SVSP staff which was screened out as a duplicate.  Id. ¶ 10.  Jones was advised that if he believes his screen-out was in error, he should return the form to the appropriate Appeals Coordinator with an explanation of why the screen-out was in error along with supporting documentation.  Id.  Jones did not challenge

4

the screen-out.  Id.

The staff assault grievance (Appeal No. SVSP-I-08-00678) was partially granted at the second level of review and returned to Jones on April 9, 2008. Medina Decl. ¶ 9, Ex. D.  Jones submitted the appeal to the Director's level of review but improperly added new claims.  D. Foston Decl. ¶¶ 2, 7 and Ex. B. The appeal was denied at the Director's level and returned to Jones on December 1, 2008.  Id. ¶ 7 and Ex. C

The grievance regarding Jones's broken glasses (Appeal No. SVSP-I-08-00679) was considered a property grievance, denied at the first level, and returned to Jones on March 24, 2008.  Medina Decl. ¶ 11 and Ex. E.  Jones did not appeal the grievance to the second or third levels of review.  Id. ¶ 14; Foston Decl. ¶ 10.

Defendants argue that except for his claims regarding the first excessive force incident, Jones did not properly exhaust any of his claims.  They have submitted copies of prison records showing that between February 2, 2008 (the date of the alleged incident) and January 13, 2008 (the date when Jones filed the instant action), Jones exhausted only two inmate appeals at the Director's level regarding claims against SVSP staff.  Foston Decl. ¶ 8 and Ex. A.  Appeal No. SVSP-I-08-00678 is the only grievance Jones appealed to the Director's level that involved the February 2, 2008 incident.  Id. ¶ 7.  In that grievance, Jones's alleged that SVSP staff broke his glasses and requested a new pair.  Jones did not allege a violation of his First Amendment rights or raise any medical claims. Furthermore, he did not allege an excessive force claim involving different Defendants or his supervisory claims.  Jones attempted to add new claims later in the appeals process, i.e., that Defendant Evans failed to train employees, that his visitation was terminated, and that he was denied medical care for five hours, but

5

he was notified that this was improper.

In opposition, Jones asserts that the grievance he filed on February 12, 2008, was intended to exhaust the excessive force claims, but that it was improperly screened out. Docket # 136 at 18. Jones claims that he did in fact challenge the screen out and subsequently tried to follow up, but that he never received a response from the appeals coordinator. Id. However, Jones fails to provide a copy of this second grievance or any evidence in support of his contention that he attempted to follow up. Jones did not properly exhaust any of the claims raised in this complaint except for the claim arising from the first excessive force incident. Accordingly, defendants' motion to dismiss all other claims should be granted.

II.     Motion for Summary Judgment

        A.     Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "[n]o genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find for the nonmoving party. But on an issue for which the

6

nonmoving party will have the burden of proof at trial, as here, the moving party need only point out "[t]hat there is an absence of evidence to support the nonmoving party's case." Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "[c]iting to specific parts of materials in the record" or "[s]howing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). A triable dispute of material fact exists only if there is sufficient evidence favoring the nonmoving party to allow a jury to return a verdict for that party. Anderson, 477 U.S. at 249. If the nonmoving party fails to make this showing, "[t]he moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

### 1.    Qualified Immunity

Under Saucier v. Katz, 533 U.S. 194 (2001), the court must undertake a two-step analysis when a defendant asserts qualified immunity in a motion for summary judgment. The court first faces "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity.

If the court determines that the conduct did violate a constitutional right, it then moves to the second step and asks "whether the right was clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02. Even if the violated right was clearly established, qualified immunity shields an officer from suit when he makes a decision that, even if constitutionally deficient, reasonably

misapprehends the law governing the circumstances he confronted.  Brosseau v. Haugen, 543 U.S. 194, 198 (2004); Saucier, 533 U.S. at 205-06.  If "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense."  Id. at 205.

B.     Claims and Analysis

1.     First Amendment

Jones first claims that defendants violated his First Amendment right when they improperly terminated his contact visits on February 2, 2008.  Defendants have shown that Jones failed to exhaust his administrative remedies with respect to this claim.  In the alternative, they assert that they are entitled to summary judgment because Jones has not set forth sufficient evidence showing that there are genuine issues for trial.  In support, they submit declarations and documentary evidence showing the following;

On February 2, 2008, Jones received a contact visit from two visitors while at SVSP.  On the same day, two visitors also visited inmate Edward Furnace, Jones's cousin.  Pursuant to prison policy, approved visitors are issued a visiting pass with the name of the inmate they are visiting, and they are only permitted to visit the inmate named on their pass.  Cross-visiting absent prior written consent by the Warden is prohibited in order to maximize visiting opportunities for inmates and their visitors and to maintain the safety and security of the prison.  Neither Jones, Furnace or their visitors had prior written authority from the Warden to cross-visit on February 2, 2008.

On the day of incident, Officers Rasley and Bittner observed Jones and Furnace cross-visiting with each others' visitors.  There were no other inmates that were cross-visiting with unapproved visitors that day.  Rasley warned Jones and Furnace that cross-visiting was not allowed as they did not have pre-approval

from the Warden, and that if they failed to adhere to the visiting policies and procedures, their visits would be terminated.  Jones and Furnace complied and stopped cross-visiting.

Approximately thirty minutes later, Rasley and Bittner observed Jones and Furnace again cross-visiting with each others' visitors.  After Rasley informed Sergeant Watson of the situation, Sergeant Watson instructed Rasley to terminate Jones's and Furnace's visits for the day.  Rasley asked the visitors to step outside of the visiting room, and then escorted Jones and Furnace with Bittner to the inmate visiting processing room.  There Jones and Furnace were informed by Rasley that their visits were terminated because the visiting procedures were violated.

Jones and Furnace claimed that they were not aware of the rule against unauthorized cross-visiting, but Rasley pointed out that they had been warned once earlier that day.  Rasley said he would comply with Jones's request to see a copy of the visiting rules as soon as Jones and Furnace submitted to an unclothed body search pursuant to prison policy, requiring inmates to submit to an unclothed body search prior to entering and/or exiting the visiting room.[3]  Jones refused to comply with Rasley's order to submit to an unclothed body search.  When he was instructed that he would have to be handcuffed, Jones refused to submit to handcuffs.

Prisoners retain those First Amendment rights not inconsistent with their status as prisoners or with legitimate penological objectives of the corrections system.  See Pell v. Procunier, 417 U.S. 817, 822 (1974).  When faced with a

_____

[3]According to Jones, Officer Rasley refused to show him a copy of the visiting rules.  SAC ¶ 38.  Jones also claims that Rasley denied his request to speak to Rasley's supervisor.  SAC ¶ 39.

9

First Amendment challenge to a prison visitation policy, a court need not determine the scope of the asserted constitutional right if it finds that the challenged policy is reasonably related to legitimate penological interests, in which case the policy must be upheld.  Overton v. Bazzetta, 539 U. S. 126, 131-32 (2003) (applying Turner v. Safley, 482 U.S. 78, 89 (1987)).

Jones claims that he has a constitutional right to speak and talk to his own family in the visiting room and that therefore, defendants violated his First Amendment right when they terminated his visit for cross-visiting with Furnace's father, Jones's uncle.  However, a prisoner has no constitutional right to access to a particular visitor.  See Keenan v. Hall, 83 F.3d 1083, 1092 (9th Cir. 1996), amended, 135 F.3d 1318 (9th Cir. 1998) (dismissing plaintiff's claim that prison authorities denied him visits from persons other than his immediate family).

Defendants submit that the challenged policy is reasonably related to a legitimate penological interest of maintaining order and prison security.  Specifically, defendants acted pursuant to California Code of Regulations title 15, section 3170.1(d) and the similar Salinas Valley Operation Procedure section 5.5.2.  Section 3170.1(d) provides that visiting simultaneously with more than one inmate at the same time requires that both inmates be approved to visit in the same visiting room, and that either: "(1) The visitors and inmates are immediate family members as defined in Section 3000; or (2) The visitor(s) has prior written approval from the institution/facility head or designee."  Section 3000 provides that aunts, uncles, and cousins are not immediate family members.

The First Amendment right to freedom of association is among the rights least compatible with incarceration.  Overton v. Bazzetta, 539 U. S. 126, 131 (2003).  Although the Supreme Court has not determined the scope of any associational rights that prisoners might retain, it has upheld a visitation policy

10

challenged on freedom of association grounds, after applying the Turner test.  Id. at 132.  The Court found that a policy restricting child visitors to immediate family members of prisoner was a reasonable response to increased management and disciplinary problems caused by an increasing number of children visiting the prison:  the policy limited the number of child visitors and ensured that child visitors had responsible adults looking after them during their visits.  Id.  The Court also found that a policy barring visits by former prisoners was a reasonable means of limiting criminal behavior, id. at 133-34, and a policy withdrawing visitation privileges from prisoners who committed multiple substance abuse violations was a reasonable disciplinary measure designed to curb the intractable problem of substance abuse within prisons by creating a credible deterrent, particularly for prisoners with few privileges left to lose, id. at 134; cf. id. (noting that policy withdrawing all visitation privileges for substance abusers for at least two years might be unconstitutional as applied to a particular prisoner).  As to each of these policies, the prisoners retained alternative means of associating with persons excluded under the visitation policy, by passing messages through permitted visitors, by writing letters and by making phone calls.  Id. at 135.  The proposed alternatives to the policy failed to demonstrate that the existing policy was unreasonable because they placed increased demands on prison resources and they did "not go so far toward accommodating the asserted right with so little cost to penological goals that they meet Turner's high standard" of showing unreasonableness.  Id.

The Supreme Court has identified four factors to consider when determining the reasonableness of a prison regulation: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative

means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives", or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." Turner, 482 U.S. at 89-90.

The challenged policy in this case satisfies the first factor. Defendants point out that the intent of the visiting regulation is "to establish a visiting process in the institutions/facilities of the department that is conducted in as accommodating a manner as possible, subject to the need to maintain order, the safety of persons, the security of the institution/facility, and required prison activities and operations." Cal. Code Regs. tit. 15, § 3710(a); Salinas Valley Operational Procedure §§ 5.1 and 5.5.1. Other restrictions include requirements that visitors undergo searches, prohibitions on bringing and passing contraband materials to inmates during contact visits, which are intended to protect inmates, correctional officers and the prison. Consistent with these interests is the requirement that visitors may not simultaneously visit with multiple inmates during the same visit, unless pre-approved by the Warden, which is designed to maintain safety and security and to prevent inmates from passing or receiving contraband with their visitors. Accordingly, the challenged policy is rationally related to valid penological interests of maintaining order and the safety and security of the prison.

As to the second factor, Jones clearly had alternative means of exercising his right of association, such as writing letters or making phone calls. See Overton, 539 U. S. at 135. Jones could also have the same visitors that visited Furnace visit him on another day. But most importantly, Jones and Furnace could have requested pre-approval for cross-visiting from the Warden and

avoided this incident altogether.  Jones does not allege that he ever made such a request and that it was unlawfully denied.  Accordingly, Jones had several alternative means to communicate with Furnace's visitors despite the restrictions within the policy at issue.

The third factor concerns the impact that simultaneous unrestricted cross-visiting by inmates and visitors at SVSP visiting room – with a capacity of 150 persons – would have on prison personnel, other inmates, and the allocation of prison resources.  Defendants contend that this accommodation would require more prison personnel to monitor visiting rooms during visiting hours and would adversely impact the safety of the inmates, correctional officers, and the prison by making it more difficult to detect and prevent the passing of contraband during visits.  Jones offers no argument in opposition to this contention.

The last factor to consider is whether the policy is an "exaggerated response to prison concerns."  Turner, 482 U.S. at 89-90.  The burden is on Jones to show "some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal."  Overton, 539 U. S. at 135-36.  Jones fails to make any such showing.

In opposition, Jones merely asserts that the version of the Salinas Valley's operations procedure set forth by defendants was adopted in April 2008, while the incident at issue occurred in February 2008.  In reply, defendants concede that while this is true, the correct version of the operational procedure that was in effect in February 2008[4] contains the same requirements as the April 2008 version.  Docket # 156 at 9.  They contend that both versions of the procedure

---

[4] Defendants submit the proper version attached as Exhibit A to the G. Ramirez Declaration with their reply.  Docket # 157.

1   mirror the essential requirements of Cal. Code Regs. tit. 15, § 3170(a), which

2   requires that inmates obtain the Warden's written consent before they can engage

3   in cross-visiting with another inmate's visitors.  Id.

4        As discussed above, this claim should be dismissed without prejudice for

5   failure to exhaust administrative remedies.  Wyatt, 315 F.3d at 1119-20.

6   However, after a careful consideration of the Turner factors, defendants are also

7   entitled for summary judgment on this claim because the challenged policy

8   regarding cross-visitation is reasonably related to legitimate penological interests

9   of maintaining the safety and security of the prison.  Accordingly, defendants are

10  entitled to judgment as a matter of law on Jones's First Amendment claim.

11                    2.    Use of Excessive Force

12        Jones's next claim is that defendants used excessive force after he

13  protested the termination of the visits, while they were escorting him to the

14  holding cell, and after he was placed therein.

15        "[W]henever prison officials stand accused of using excessive physical

16  force in violation of the Cruel and Unusual Punishments Clause, the core judicial

17  inquiry is . . . whether force was applied in a good-faith effort to maintain or

18  restore discipline, or maliciously and sadistically to cause harm."  Hudson v.

19  McMillian, 503 U.S. 1, 6-7 (1992).  In determining whether the use of force was

20  for the purpose of maintaining or restoring discipline, or for the malicious and

21  sadistic purpose of causing harm, a court may evaluate the need for application of

22  force, the relationship between that need and the amount of force used, the extent

23  of any injury inflicted, the threat reasonably perceived by the responsible officials

24  and any efforts made to temper the severity of a forceful response.  Id. at 7.

25        Defendants assert that they are entitled to summary judgment because the

26  force used was not excessive, and there is no evidence that they used force against

27

28                                    14

Jones "maliciously and sadistically" for the purpose of causing harm.  In support, they submit declarations and documentary evidence showing the following;

After Officers Rasley and Bittner escorted Jones and Furnace to the inmate visiting processing room, they ordered the inmates to submit to an unclothed body search pursuant to prison policy. Jones refused to comply with Rasley's order, and then also refused to submit to handcuffs.  See supra at 8.

When Rasley reached for Jones's arm to turn him around and apply handcuffs, Jones pushed Rasley away and clenched his fists.  As Rasley stepped back to reach for his pepper spray, Furnace, who had been standing behind Jones, stepped forward and hit Rasley on the left side of his face.  Rasley stepped back while Furnace continued to advance and strike Rasley in the face with a closed fist.  Rasley was bleeding after Furnace had struck him several more times with his fists.  Rasley activated his personal alarm and drew his baton, all the while ordering Furnace to stop and get down.  Furnace then grabbed Rasley and pulled him into a bear hug, continuing to hit Rasley with his closed right fist.  Rasley continued to verbally order Furnace to get down the entire time.

When Furnace began striking Rasley, Bittner repeatedly ordered both Jones and Furnace to get down and "prone out," but both inmates ignored his orders.  While Furnace was striking Rasley, Jones charged Bittner while swinging his clenched fists.  Bittner responded by grabbing Jones and using his body weight to take Jones to the floor in an attempt to stop the assault and gain control. While lying on top of Jones, Bittner continued to order Jones to stop resisting and submit to handcuffs, but Jones ignored the orders and repeatedly struck Bittner in the face with clenched fists.  Jones then began to press his thumbs into each of Bittner's eyes.  Bittner responded by striking Jones with his fists and then grabbing his arms and pinning them to the floor.  Jones then bit Bittner on his

1   forehead, causing Bittner to release Jones's arms and push Jones's head away
2   from him.

3       When Officers Atchley and Nuckles arrived on the scene in response to the
4   alarm, they saw Furnace on top of Rasley, hitting him repeatedly in the face with
5   his right fist.  Rasley was lying on his back underneath Furnace, his face covered
6   with blood.  Bittner was on top of Jones, struggling with him to gain control.
7   Fearing for Rasley's life, Atchley and Nuckles used their batons on Furnace, and
8   Rasley managed to get out from under him.  Furnace then began hitting and
9   kicking Atchley and Nuckles.

10      Officers Santos and Tomasian arrived on the scene and held Jones's arms
11  down to stop his strikes on Bittner.  When Officer Blevins arrived at the scene, he
12  saw Bittner and other officers trying to gain control of Jones.  Jones was on the
13  floor, kicking with both legs and trying to break out of the officers' holds.
14  Blevins handcuffed Jones, double-locking the handcuffs so that they could not be
15  tightened, as was his normal practice.  Bittner was escorted by Atchley to Facility
16  C Health Services to receive immediate medical attention.

17      When Officer Nicholson arrived on the scene, Jones was lying on his
18  stomach on the floor in handcuffs but still resisting officers by repeatedly and
19  violently kicking his legs up in a backwards motion.  Nicholson placed his left
20  hand on Jones's left leg, and his right hand on Jones's right leg so that Blevins
21  could place irons on Jones's legs.  Blevins also used his body weight to gain
22  control of Jones's legs and to hold them down.  By the time Officers Roman and
23  Scarlett arrived at the scene, Jones was already in handcuffs and leg restraints.
24  Nuckles then ordered Officers Quevedo[5] and Roman to escort Jones to the C

25

26      [5]Defendant D. Quevedo has not been served in this matter as his summons
27  was returned unexecuted with the remark "not employed by CDC."  Docket # 51.

28                                      16

Health Services Annex.  Scarlett was ordered to go to the Health Annex and clear the holding cells in advance of the escort.  Scarlett checked holdings cells nos. 3 and 5, which were negative for contraband.  Nuckles remained with Santos in the Visiting Center to document evidence, and then went to the Visiting Center to help clear it of inmates and visitors.  Nicholson left the Visiting Center and went to visit Rasley at the medical facility; Nicholson did not see Jones again that day.

Tomasian helped escort Jones out of the door of the Visiting Center, but once they exited, he was told that other officers would complete the escort. Tomasian observed the escort of Jones to the entry of the Health Annex.  The escort was uneventful, and Tomasian did not observe anyone use any force against Jones during this escort.

Jones was brought into the Health Annex doorway without incident. Officer Scarlett was waiting inside the Health Annex while Jones was placed in holding cell no. 5 by Quevedo and Roman.  Once Jones was secured in the holding cell, Scarlett uncuffed Jones through the food port and took his t-shirt for evidence.  Nurse Eckert did a medical evaluation of Jones at the front of the holding cell.  Scarlett did not open Jones's holding cell after it was secured, nor did he kick or stomp Jones or use any other unnecessary force.

Holding cell no. 5 is in a separate room within the Health Annex building and Officer Kircher did not observe the placement of Jones into the holding cell. Atchley, Nuckles, Nicholson and Tomasian were not present when Jones was placed in holding cell no. 5.

According to Jones's own testimony, he was evaluated by defendants Richmond, Eckert and Okelly within twenty to thirty minutes after being placed in the holding cell.  J. Goldman Decl., Ex. 2, T. Jones Dep. 157:1-11, 158:13-159:9, 160:18-161:12.  Jones's medical records show that he received a medical

examination from Richmond from 1:20 to 1:40 p.m. on February 2, 2008.  Id., Ex. 3.  Jones's injuries consisted of three bleeding cuts, abrasions, bruises and reddened areas, a swollen hand, and a bump on his forehead.  Jones also testified that he received further medical treatment on February 2, 2008, when ointment and butterfly bandages were applied to his cuts during a second examination by Richmond at 6:00 p.m.  Jones Dep.154:21-155:12, 166:20-167:1.

As a result of the February 2, 2008 incident, Rasley suffered numerous contusions and abrasions to his facial area, including nineteen stitches to his chin and face.  Rasley was transported from SVSP's medical facility to a hospital for treatment, and did not return to work for approximately two weeks.

As a result of the February 2, 2008 incident, Bittner suffered a bite to his forehead, swollen eyes, cuts and bruises.  Bittner was transported from SVSP's medical facility to a hospital for treatment, and did not return to work for approximately four weeks.

As a result of the February 2, 2008 incident, Atchley suffered a strained elbow and wrist, and was taken to a hospital for treatment.  He did not return to work for approximately one week after the incident.

Under defendants' version of the facts, no reasonable jury could find that defendants used force maliciously and sadistically to cause Jones harm.  See Hudson, 503 U.S. at 6-7.  Jones refused orders to submit to an unclothed body search and to being handcuffed by Rasley, and thereafter ignored Bittner's repeated commands to prone out.  While Furnace was assaulting Rasley, Jones attacked Bittner.  Bittner then acted reasonably in defending himself and using his body to immobilize Jones who continued to resist.  When Atchley, Nuckles, Santos, Tomasian, and Blevins arrived in response to the alarm, Rasley and Bittner were still struggling with Furnace and Jones, which prompted the

defendants to respond reasonably in using force sufficient to get Jones and Furnace under control. When Nicholson arrived on the scene, Jones was still struggling despite being handcuffed, which required irons be placed on his legs. Although Jones suffered some injuries consisting of three bleeding cuts, abrasions, bruises and reddened areas, a swollen hand, and a bump on his forehead, the extent of the injuries inflicted on defendants Rasley, Bittner and Atchley were much more severe.

Jones's version of the facts is different in that he maintains that defendants unreasonably used excessive force while he offered no resistance. In support, he submits the following facts under penalty of perjury in his complaint:

Jones claims he merely asked Rasley and Bittner to see the rules and regulations and to speak to their supervisor and that he was "beat for doing so." SAC ¶ 41. Jones claims that Bittner head butted him, "knocking him backwards, then grabbing his legs [and] slamming him to the ground without any warning." Id. Then officers C. Blevins, C. Santos, D. Quevedo, T. Tomasian, M. Nicholson, and A. Roman arrived while Bittner was still on top of him and put Jones in handcuffs and leg irons. SAC ¶ 44. After Jones was shackled, Santos repeatedly hit Jones on the head with a closed fist, knocking Jones' prescription glasses off his face. SAC ¶ 46. Santos then deliberately stomped on Jones' glasses. SAC ¶ 46. Tomasian hit Jones in his face and head with a closed fist, as well as kneeing Jones in his back. SAC ¶ 47. Quevedo kicked Jones in his head, as well as repeatedly punching and hitting Jones in the face with a closed fist. SAC ¶ 48. Nicholson kneed Jones in the fold of his leg, driving Jones's knee caps into the concrete "over and over." SAC ¶ 50. When Jones attempted to move his knees, Blevins began to knee Jones's other knee into the concrete in the same manner.

Then Tomasian, Blevins, Roman and Quevedo carried him outside, threw him on the concrete pavement and began punching and kicking his head, face, side and stomping on his leg under the supervision of Officer Nuckles.  SAC ¶ 52-53.  The beating stopped once Nuckles informed the officers that there was a group of visitors watching.  SAC ¶ 54.  Defendants then picked Jones up off the ground and carried him towards the entrance gate of the patio, and then deliberately ran his head into the steel framing of the door causing his head to "bust" open."  SAC ¶ 55.  Rodriguez also kicked Jones in his chest while officers were carrying him.  SAC ¶ 57.  Officers continued to carry Jones to the hobby shop where they ran his head into the steel framing of the door, and then backed up and did it again, "splitting [Jones's] head open."  SAC ¶ 58.

Jones maintains that officers carried him into holding cage no. 5, and after dropping him to his knees, began kicking him in his back and buttocks and stomping on his leg while Nuckles, Atchley and Kircher observed.  SAC ¶ 59.  Then Nicholson ordered Quevedo and Tomasian to pick Jones up off his knees, and then proceeded to slam his face and forehead into the back of the steel cage repeatedly while the other officers looked on.  SAC ¶ 60.  Atchley and Kircher watched as their subordinate officers used excessive force on Jones and then wrote false reports to conceal the officers' malfeasance.  SAC ¶ 61.  Zavala, Rodriguez, Morano, Ponce and Argueta watched as Scarlett kicked and stomped on Jones who was still in handcuffs and leg irons.  SAC ¶ 62.

Defendants contend that Jones gave contrary testimony in his deposition and that no reasonable jury could believe Jones's allegations.  Jones admitted that he struggled and resisted Bittner's efforts to control him.  Jones Dep. 68:19-21.  Jones also admitted that he could not identify the officers who responded to Rasley's alarm, escorted Jones from the Visitors Center to the Health Annex, and

placed him into the holding cell.  Jones Dep. 53:8-54:20, 57:6-17, 91:13-20, 94:7-95:2, 109:6-111:18, 141:7-20, 145:6-24.  In a supplemental opposition, Jones submits the declaration of his cousin, Edward Furnace, who also maintains that officers used excessive force on him and Jones.  Docket # 166, Ex. E.  However, other than Rasley and Bittner, Furnace fails to identify specific defendants by name or describe each defendants' actions.  Id.

Viewing the evidence in the light most favorable to Jones, as we must, a reasonable jury could find that defendants used unreasonably excessive force against Jones in the Visiting Center search room and during the escort to the Health Annex.  Although Jones's resistance created a need for defendants to apply reasonable force to control him in order to maintain discipline and order, punching, hitting and kneeing Jones after he was taken down and in shackles supports the finding that the force used by defendants was unreasonably excessive or brutal.  Hudson, 503 U.S. at 9-10.

Nor are defendants entitled to qualified immunity on Jones's excessive force claims at this stage in the proceedings.  Viewing the facts in the light most favorable to Jones, it cannot be said that a reasonable officer in defendants' position would have believed that punching, hitting and kneeing Jones after he was taken down was reasonably necessary to maintain discipline and order, and thus lawful.  Cf. Marquez v. Gutierrez, 322 F.3d 689, 692-93 (9th Cir. 2003) (granting qualified immunity where reasonable officer could believe that shooting one inmate in the leg to stop an assault that could have seriously injured or killed another inmate was a good faith effort to restore order, and thus lawful).

For clarification, it is undisputed that Jones administratively exhausted the excessive force claims arising from what transpired in the Visiting Center search room, where defendants allegedly broke his glasses.  Furthermore, the alleged

actions of defendants as they were escorting Jones from the search room appear related to what transpired therein.  However, it appears Jones did not exhaust the claims of excessive force based on defendants' alleged actions after he was placed in the holding cell.  Accordingly, the excessive force claims arising from what occurred after he was placed in the holding cell are dismissed without prejudice for failure to exhaust administrative remedies**.**

While resolution of the factual issues may well relieve defendants of any liability in this case, if Jones's version of the facts were to prevail at trial, a reasonable jury may conclude that defendants used unreasonably excessive force in violation of Jones's Eighth Amendment rights once they had handcuffed and shackled him in the Visiting Center.  Summary judgment is not appropriate as to Jones's excessive force claim against defendants Bittner, Blevins, Santos, Quevedo, Tomasian, Nicholson, and Roman because there are genuine disputes of material fact for trial and qualified immunity is not in order as a matter of law.

3.    Deliberate Indifference to Serious Medical Needs

Jones's third claim is that defendants acted with deliberate indifference to his serious medical needs when they failed to provide him with medical treatment for five to six hours after they became aware of his injuries.

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976).  A "serious medical need" exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled in part on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  A prison official is "deliberately indifferent" if he knows that a prisoner faces a substantial risk of

serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994).

Negligence cannot establish liability under the Eighth Amendment. Id. at 835-36 & n.4. An "official's failure to alleviate a significant risk that he should have perceived but did not, . . . cannot under our cases be condemned as the infliction of punishment." Id. at 838. Instead, "the official's conduct must have been 'wanton,' which turns not upon its effect on the prisoner, but rather, upon the constraints facing the official." Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing Wilson v. Seiter, 501 U.S. 294, 302-03 (1991)). In order for deliberate indifference to be established, there must be a purposeful act or failure to act on the part of the defendant, as well as resulting harm. McGuckin, 974 F.2d at 1060.

According to Jones, he received multiple injuries to his back, face, head and knees for which he did not receive medical treatment for about five hours. SAC ¶ 63. Jones claims that defendants A. Richmond, A. Butt, M. Eckert and B. Okelly knew Jones was bleeding from his face and head and unable to stand because of the pain and yet refused him medical treatment from 1:05 p.m. to 6:28 p.m. SAC ¶ 64. Even after Jones informed Richmond, Butt, Eckert and Okelly that he was in excruciating pain and could not feel his legs and that he feared that something was seriously wrong, defendants ignored him and left without providing medical treatment. SAC ¶ 68.

Defendants submit evidence contradicting Jones's medical indifference claims, including Jones's own testimony, showing that he was evaluated by defendants Richmond, Eckert and Okelly within twenty to thirty minutes after being placed in the holding cell. Jones's medical records show that he received a medical examination from Richmond between 1:20 and 1:40 p.m. on February 2,

2008.  Goldman Decl., Ex. 3.  Jones's injuries consisted of three bleeding cuts, abrasions, bruises and reddened areas, a swollen hand, and a bump on his forehead.  Jones testified that he received medical treatment on February 2, 2008, when ointment and butterfly bandages were applied to his cuts during a second examination by Richmond at 6:00 p.m.

Based on this evidence, it cannot be said that Jones's injuries were so serious that the failure to treat his condition for five to six hours resulted in further significant injury or the unnecessary and wanton infliction of pain.  Although Jones claims that he could not feel his legs, there was nothing from their initial examination to indicate to defendants that Jones had suffered any serious injuries to his legs.  Furthermore, there is no evidence that based on their initial examination of Jones, defendants knew or should have known that he faced a substantial risk of serious harm from his cuts and bruises and yet disregarded that risk by failing to take reasonable steps to abate it.  Farmer, 511 U.S. at 837.  Lastly, Jones does not allege that he suffered further harm due to defendants' failure to act.

At most, Jones's allegation that defendants delayed treatment for his cuts and abrasions five to six hours indicates negligence on their part, which is insufficient to make out a violation of the Eighth Amendment.  See Toguchi v. Chung, 391 F.3d 1051, 1060-61 (9th Cir. 2004); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002);  Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981); see, e.g., Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998) (finding no merit in claims stemming from alleged delays in administering pain medication, treating broken nose and providing replacement crutch, because claims did not amount to more than negligence); McGuckin, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a

24

prisoner's 8th Amendment rights); <u>O'Loughlin v. Doe</u>, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain); <u>Anthony v. Dowdle</u>, 853 F.2d 741, 743 (9th Cir. 1988) (no more than negligence stated where prison warden and work supervisor failed to provide prompt and sufficient medical care). As discussed above, this claim should be dismissed without prejudice for failure to exhaust administrative remedies.  <u>Wyatt</u>, 315 F.3d at 1119-20.  However, defendants Richmond, Butt, Eckert and Okelly are also entitled to judgment as a matter of law on this claim.

4.   <u>Supervisor Liability</u>

Jones's final claim is that defendants Hubbard, Evans, Neotti and Ponder are liable as supervisors for failure to train and supervise their subordinates who were responsible for violating Jones's rights.  Jones claims that defendant supervisors created policies and practices designed to violate his rights.  SAC at 11-12.

Jones's claims against these supervisory defendants fail because he does not allege that defendants were ever directly involved with the violations alleged in the instant action or that they were ever personally aware of Jones's situation. Supervisor defendants are entitled to qualified immunity where the allegations against them are simply "bald" or "conclusory" because such allegations do not "plausibly" establish the supervisors' personal involvement in their subordinates' constitutional wrong.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675-84 (2009) (noting no vicarious liability under Section 1983 or <u>Bivens</u> actions).  So it is insufficient for a plaintiff only to allege that supervisors knew about the constitutional violation

and that they generally created policies and procedures that led to the violation, without alleging "a *specific* policy" or "a *specific* event" instigated by them that led to the constitutional violations.  Hydrick v. Hunter, 669 F.3d 937, 942 (9th Cir. 2012) (emphasis in original); cf. Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) (finding no qualified immunity where plaintiff pled specific facts that plausibly suggest supervisors' "knowledge of" and "acquiescence in" unconstitutional conduct of subordinates).  The only specific policy at issue in the instant action is the visiting procedure, which the court has already determined to be reasonably related to a legitimate governmental interest.  See supra at 13-14.

If the defendant is a supervisor who had no direct involvement in or direct management responsibility for the alleged constitutional deprivation, the qualified immunity defense must be examined within the context of policy-level activities.  Jeffers v. Gomez, 267 F.3d 895, 916 (9th Cir. 2001) (suggesting that director of state prison system could be held liable for inadequate training of prison guards on how to respond to a prison riot only if prison director recklessly, maliciously or deliberately established policies that caused Eighth Amendment violations).  Here, Jones has made only conclusory allegations and has failed to provide evidence showing that defendants were ever personally involved or connected to the alleged violations.

Jones asserts in opposition that defendants were aware of the constant use of excessive force at SVSP and requests that the court take judicial notice of articles related to alleged incidents at SVSP and Pelican Bay State Prison.  Docket # 137.  The request is DENIED as such irrelevant and unrelated articles are not items which judicial notice may be properly taken.

"Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*,

556 U.S. at 667.  Jones makes no factual allegations against supervisor defendants indicating that they knew personally that Jones faced violations of his constitutional rights and yet failed to prevent them.  Accordingly, defendants Hubbard, Evans, Neotti and Ponder are entitled to qualified immunity.  *Id.* at 675-84.

III.   <u>State Tort Claims</u>

Jones also raised state law claims in his complaint over which this court did not specifically exercise supplemental jurisdiction.  Nevertheless, defendants argue that the state claims must be dismissed because Jones failed to comply with California's Tort Claims Act.

Under California law, the filing of a tort claim in the time and manner prescribed is a prerequisite to the filing of a lawsuit against any state employee or agency.  Cal. Gov. Code §§ 905.2, 911.2, 945.4, 950.2; <u>Munoz v. California</u>, 33 Cal. App. 4th 1767, 1776 (1995).  California's Tort Claims Act provides the requisites for the filing of a tort claim against employees of the State of California.  Where recovery of damages from a public employee is sought, the Tort Claims Act requires the presentation to the Board, in accordance with its provisions, of all claims for money or damages against the public entity.  Cal. Gov. Code §§ 905, 905.2.  Section 911.2 specifies that a claim relating to injury to the person must be presented within six months of the accrual of the cause of action.  Section 945.4 specifies that absent a timely claim, no action may be brought against the public entity.  Section 950.2 states that a cause of action against a public employee for injury resulting from an act or omission in the scope of his or her employment is barred if an action against the employing public entity is barred.  <u>Fisher v. Pickens</u>, 225 Cal. App. 3d 708, 718 (1990).

Jones submitted his tort claim to the Board in April 30, 2009, over fourteen

months after his cause(s) of action accrued.  Docket # 114, Ex. B.  On May 6,
2009, the Board rejected the claim because it was not presented within six months
of the alleged incident.  Id.  Pursuant to section 946.6, Jones had until November
6, 2009 (i.e., six months from the date the Board denied the application to present
a late tort claim) to file a petition with the appropriate court to relieve him of the
tort claim requirements.[6]  But Jones never filed such a petition.  Accordingly,
Jones's state law tort claims are barred by the filing requirements of California's
Tort Claims Act.  See Williams, 16 Cal. 3d at 842.

       In opposition, Jones asserts that he was not required to comply with the
California Tort's Claims Act before filing the instant action.  Docket # 136 at 23.
Jones is correct that he need not exhaust state court remedies under the PLRA.
See Jenkins v. Morton, 148 F.3d 257, 259-60 (3d Cir. 1998).  However, Jones was
required to comply with state law requirements before proceeding with state
claims in this court.  Jones's failure to pursue the procedures set out in the Tort
Claims Act and file a timely court petition to relieve him of the tort claim filing
deadlines before he filed suit renders his state law claims barred under California
law.  See id. (compliance with tort claim filing deadlines is a condition precedent

---

[6]The Board may grant an application to present a late claim if the
applicant can meet certain criteria, such as demonstrating that the failure to
present a timely claim was because of mistake, inadvertence, surprise or
excusable neglect.  Cal. Gov. Code § 911.6.        If the Board denies an
application to present a late claim, the applicant must petition the appropriate
court for an order relieving him or her from the provisions of section 945.4
before filing suit.  Id. § 946.6.  Such a petition must be filed with the court within
six months from the date the application for leave to present a late claim was
denied by the Board.  Id.
       Timely presentation of a claim against a public entity or employee is not
merely a procedural requirement under the Tort Claims Act, but a condition
precedent to the plaintiff's maintaining an action against the defendant and
therefore an element of the plaintiff's cause of action.  See Williams v. Horvath,
16 Cal. 3d 834, 842 (1976).

to plaintiff's maintaining action against  defendant and an element of plaintiff's cause of action).

IV.    Unserved Defendant D. Quevedo

The summons for defendant D. Quevedo that was sent to SVSP, where Jones indicated he was located, was returned unexecuted on September 15, 2010, with the following remark: "Returned. 'Not employed by CDC.'"  Docket # 51. Accordingly, D. Quevedo has not been served.

Although a plaintiff who is incarcerated and proceeding in forma pauperis may rely on service by the Marshal, such plaintiff "may not remain silent and do nothing to effectuate such service"; rather, "[a]t a minimum, a plaintiff should request service upon the appropriate defendant and attempt to remedy any apparent defects of which [he] has knowledge." Rochon v. Dawson, 828 F.2d 1107, 1110 (5th Cir. 1987).  Here, Jones's complaint has been pending for over 120 days, and thus, absent a showing of "good cause," his claims against Quevedo are subject to dismissal without prejudice.  See Fed. R. Civ. P. 4(m).

Jones has not provided sufficient information to allow the Marshal to locate and serve D. Quevedo, and consequently Jones must remedy the situation or face dismissal of his claims against this defendant without prejudice.  See Walker v. Sumner, 14 F.3d 1415, 1421-22 (9th Cir. 1994)(holding prisoner failed to show cause why prison official should not be dismissed under Rule 4(m) where prisoner failed to show he had provided Marshal with sufficient information to effectuate service).  Accordingly, Jones must provide the Court with this defendant's accurate current location such that the Marshal is able to effect service.

**CONCLUSION**

For the foregoing reasons,

29

1.    Defendants' motion to dismiss is GRANTED.  Defendants' motion for summary judgment (docket # 95) is GRANTED IN PART and DENIED IN PART.  Defendants Blevins, Roman and Scarlett's motion for summary judgment (docket # 123) is DENIED.

2.    The court finds that a referral to a magistrate judge for settlement proceedings is in order with respect to Jones's claim of excessive force against defendants Bittner, Blevins, Santos, Quevedo, Tomasian, Nicholson, and Roman as discussed above and hereby REFERS this case to Magistrate Judge Vadas for settlement proceedings.  All other proceedings are stayed.

The clerk shall terminate all other defendants from this action.

3.    A settlement conference shall take place within 120 days of the date of this order, or as soon thereafter as is convenient to the magistrate judge's calendar.  Magistrate Judge Vadas shall coordinate a time and date for the conference with all interested parties and/or their representatives and, within ten (10) days after the conclusion of the conference, shall file with the court a report regarding the conference.

The clerk shall provide a copy of this order to Magistrate Judge Vadas.

4.    Jones must file notice and provide the Court with the accurate current location of defendant D. Quevedo such that the Marshal is able to effect service.  **If Jones fails to provide the court with an accurate current location for this defendant <u>within thirty (30) days</u> of the date this order is filed, his claims against Quevedo will be dismissed without prejudice pursuant to Rule 4(m) of the Federal Rules of Civil Procedure**.

SO ORDERED.

DATED: <u>Oct. 29, 2012</u>

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\CR.10\Jones, T1.msj-sett.hhl.wpd